UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 98-6559-CIV-ZLOCH

ROBERTA SANTINI, M.D.,

    Plaintiff.

vs.

CLEVELAND CLINIC FLORIDA,

    Defendant.

_____/

## ORDER IMPOSING SANCTIONS

THIS CAUSE is before the Court upon its sua sponte consideration of whether sanctions should be imposed against Plaintiff Roberta Santini, (current) attorney Bartley Miller, and (former) attorney Heidi Friedman for concealing from the Court and Defendant that Santini and her counsel had, in fact, received an EEOC right-to-sue notice by February 2, 1998. The matter is before United States Magistrate Judge Barry S. Seltzer pursuant to the consent of the parties.

## BACKGROUND

On May 29, 1998, Roberta Santini, M.D., brought this action against her former employer, Cleveland Clinic Florida (the "Clinic"), pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 2000 U.S.C. § 2000e et seq., the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and the Florida Civil Rights Act ("FCRA"), Chapter 760, Fla. Stat. Santini alleges that her former supervisors sexually harassed her, subjected her to a hostile working environment, and discriminated against her on the basis of her age

and gender. She further alleges that the Clinic retaliated against her for assisting in investigations of other employees' sexual harassment claims.

On March 22, 1999, the Clinic moved for summary judgment, arguing that Santini had failed to timely file her Title VII and ADEA claims.[1] Both parties submitted memoranda, affidavits, and exhibits in support of their respective positions, and the Court conducted an evidentiary hearing and received argument of counsel.

With respect to Santini's Title VII and ADEA claims, the sole issue raised by the Clinic's summary judgment motion was whether Santini had failed to commence this action within 90 days of her receipt of the EEOC's Right-to-Sue Notice.[2] In support of its motion, the Clinic submitted, inter alia, the affidavit of EEOC Office Automation Assistant Jeffrey Woods, the affidavit of United States Postal Service Clerk Frank Deona, the affidavit of Clinic attorney Daniel F. Tordella, and excerpts from Santini's deposition. Attached to these affidavits and Santini's deposition excerpts were various documents, including

---

[1] The Clinic also argued that Santini failed to exhaust her administrative remedies with respect to her state claims under the FCRA. Those claims are not pertinent to the issue of sanctions. By Order entered simultaneously herewith, the Court has granted summary judgment in favor of the Clinic on Santini's Title VII and ADEA claims and has dismissed Santini's FCRA's claims, declining to exercise supplemental jurisdiction over these state law claims.

[2] Timely filing is a prerequisite to maintaining a Title VII and ADEA action. Under Title VII, when the EEOC dismisses a discrimination charge, the agency is required to notify the aggrieved person that she has a right to sue and that "within ninety days after the giving of such notice, a civil action may be brought. . . ." 42 U.S.C. § 2000e-5(f)(1). Similarly, the ADEA provides that an aggrieved person may bring a civil action within 90 days after receiving a notice of dismissal of a charge. 29 U.S.C. § 626(e). The burden of establishing that a Title VII/ADEA action has been timely filed rests with the plaintiff. Jackson v. Seaboard Coast Line R.R. Co., 678 F.2d 992, 1010 (11th Cir. 1982).

Santini's Charge and Amended Charge of Discrimination, an August 12, 1997 letter to the

EEOC from Heidi Friedman, an undated Right-to-Sue Notice, a March 2, 1998 Right-to-

Sue Notice, the EEOC log, a receipt for certified mail, and a return receipt signed by Elsa

Santini. Through its submissions, the Clinic established the following:

1.   On March 11, 1997, Santini timely filed a Charge of Discrimination with the

Broward County Human Rights Division ("BCHRD"), asserting the Clinic had

discriminated against her on the basis of her age (45) and her gender (female).  Santini

directed that the charge be filed with both the EEOC and "the State or local agency," which

she identified as "Broward County Human Rights Division."  On May 8, 1997, Santini added

a retaliation claim to her Charge.  Attorney Heidi Friedman was Santini's attorney of record

during the administrative proceedings.[3]

2.  Both the original Charge and the Amended Charge identify Santini's address as

"2820 North Atlantic Blvd., Fort Lauderdale, FL 33308."

3.   On August 12, 1997, Santini's counsel wrote to the EEOC acknowledging

receipt of the BCHRD's Order of Determination[4] and requesting a right-to-sue letter.

4.   On or about January 27, 1998, the EEOC issued an undated Dismissal and

Notice of Right ("Right-to-Sue Notice" or "Notice").  The Notice informed Santini that the

---

[3] Attorney Bartley Miller was then a partner and Friedman an associate with the
same law firm.  Santini testified that although Miller was her attorney, Friedman handled
her case during the administrative process.  Shortly after filing Santini's Complaint,
Miller left the firm.  However, he has continued to represent Santini.

[4] Pursuant to a worksharing agreement with the EEOC, the BCHRD was initially
responsible for investigating Santini's Charge.  Upon conclusion of its investigation, the
BCHRD determined that no reasonable cause existed to believe the Clinic had
discriminated or retaliated against Santini on the basis of her age or gender; it then
issued an Order of Determination.

EEOC had closed its file on her Charge because it had adopted the findings of the local agency that had investigated it.  The Notice further advised Santini that she had the right to bring a civil action in state or federal court.  And it unequivocally stated that she would lose this right if she did not file suit within 90 days after she received the Notice.

5.  On January 27, 1998, the EEOC sent by certified mail the undated Right-to-Sue Notice to the address Santini had provided in her Charge.  It also sent by regular mail a copy of the Notice to the Clinic's attorney (Tordella) and purportedly to Santini's attorney (Friedman).

6.  On February 3, 1998, Clinic attorney Tordella received a copy of the undated Notice and forwarded it to his client.

7.  On or about March 2, 1998, the EEOC mailed a second Right-to-Sue Notice to Santini and counsel for both parties.

8.  On May 29, 1998 (122 days after issuance of the undated Notice, but 88 days after issuance of the March 2, 1998 Notice), Santini filed her Complaint, attaching the March 2, 1998 Notice only.

At her October 13, 1998 deposition,[5] Roberta Santini testified that she had received the March 2, 1998 Right-to-Sue Notice from the EEOC.[6]  When questioned about receiving the earlier undated Notice, Santini testified as follows:

> Q.  Did you receive any other right-to-sue letter besides the

---

[5]  Attorney Miller represented Santini at her deposition.

[6]  When shown the March 2, 1998 Notice by opposing counsel, Santini inquired, "March 2, is that the right date?"  Miller responded, "That is the right date."  Santini acknowledged Miller's comment by stating "Ah-huh."  This exchange can be heard on the video recording of the deposition, but it is not reflected in the transcript.

one that is attached to your Complaint [the March 2, 1998 Notice]?

A.  I don't – I would have to refer to my papers.  I don't know if there was any other paper that made that statement.  But I was aware of the fact that I had the right to sue.

Q.  When did you first become aware of the fact that you had the right to sue?

A.  Well, I'm assuming it was at the time I received these papers?

Q.  Do you recall receiving an earlier [than the March 2 Notice] right-to-sue letter?

A.  Offhand, no.  But I would have to check.  I don't know.

Q.  Do you know whether your counsel, Bartley Miller, or Ms. Friedman – received an earlier right-to-sue letter?

A.  I don't know.

Santini Dep. at 38-39.

When shown a copy of the undated Right-to-Sue Notice and asked whether she had seen it, Santini responded: "It looks very similar to the others.  It doesn't have a date. That's the only difference that I see offhand."  Santini testified that she did not know whether she or either of her attorneys (Miller or Friedman) had received a copy of the undated Notice.  Santini Dep. at 40-42.

At a continuation of her deposition, Santini produced her file, purportedly containing all the documents she had received from the EEOC.  Santini Dep. at 465-86.  This file contained a copy of the March 2, 1998 Right-to-Sue Notice but not the earlier undated Notice.  When asked again whether she was certain that she had not received a right-to-sue notice before the March 2, 1998 Notice, Santini responded: "I don't recall seeing it.

5

But I am not an attorney, so I don't know the details. I mean I don't recall seeing it." Santini

Dep at 486   She further stated: "I can only say I don't recall seeing it, and as far as I

know, I didn't. But to me this looks very similar [to the March 2, 1998 Notice]. I don't know

if I would have noticed any difference between the two." Santini Dep. at 486.

In this Circuit, the 90 day period for filing a Title VII or ADEA claim commences upon

receipt of a right-to-sue notice. Stallworth v. Wells Fargo Armored Servs. Corp., 936 F.2d

522, 523 (11th Cir. 1991). Consequently, had Santini received the first (undated) Right-to-

Sue Notice more than 90 days before filing her May 29, 1998 Complaint, her federal claims

would have been time-barred (absent equitable tolling).   But if the 90 day period were

triggered by her receipt of the second (March 2, 1998) Notice, her claims would have been

timely filed.

Having no evidence that Roberta Santini herself had received the first (undated)

Right-to-Sue Notice, the Clinic argued that the 90 day period was triggered upon receipt

of the (undated) Right-to-Sue Notice by Santini's mother on January 29, 1998.[7] In support

of its position, the Clinic relied on numerous decisions from this Circuit holding that the 90

day period begins to run from the receipt of a right-to-sue notice by some responsible

individual at the plaintiff's residence, notwithstanding that the plaintiff did not acquire

knowledge of the notice's receipt until sometime later. See, e.g., Bell v. Eagle Motor Lines,

---

[7] To show receipt, the Clinic submitted the following: the affidavit of an EEOC representative, who averred that the Santini file contained a receipt for certified mail; the EEOC's receipt bearing No. Z 280 441 188; the affidavit of a United States Postal Service Clerk, whose investigation revealed that Article No. Z 280 441 188, addressed to Roberta Santini at her residence, was delivered on January 29, 1999, and signed for by "Elsa Santini"; a copy of the receipt signed by "Elsa Santini" on January 29, 1999; and the parties' stipulation that Elsa Santini is Roberta Santini's mother.

Inc., 693 F.2d 1086, 1087 (11th Cir. 1982)(holding that 90 day period was triggered when plaintiff's wife received right-to-sue notice at their residence); Martinez v. United States Sugar Corp., 880 F. Supp. 773, 777 (M.D. Fla. 1995)(holding that 90 day period begins to run upon receipt of right-to-sue notice at plaintiff's residence), aff'd, 77 F.3d 497 (11th Cir. 1996). See also Law v. Hercules, Inc., 713 F.2d 691, 693 (11th Cir. 1983)(holding that 90 day period triggered when plaintiff's 17 year old son picked up right-to-sue notice from post office at plaintiff's request).[8]

The Clinic also argued that Santini's receipt of the second (March 2, 1998) Right-to-Sue Notice was legally immaterial, relying on Gitlitz v. Compagnie Nationale Air France, 129 F.3d 554, 557 (11th Cir. 1997). In Gitlitz, the plaintiff received an EEOC right-to-sue notice. After contacting his congressman, he received a second right-to-sue letter, which

---

[8] The Clinic also noted that Santini's attorney was presumed to have received the Notice on January 30, 1998, three days after the date of mailing. The court in Brown v. Commonwealth Life Ins. Co., 22 F. Supp. 2d 1325 (M.D. Ala. 1998), explained the rebuttable presumption of receipt:

> Under the common law, a plaintiff can create a rebuttable presumption that an item was received by an addressee by providing evidence that it was properly sent. Currie v. Great Central Ins. Co., 374 So.2d 1330 (Ala.1979); see also Konst v. Florida East Coast Railway Co., 71 F.3d 850 (11th Cir.1996). A defendant can then rebut the presumption by providing evidence that the item was not received. This evidence does not conclusively rebut the presumption, but creates a question of fact. Billingsley v. State, 367 So.2d 553 (Ala.Crim.App.1978)(applying rule to mailing of demand for speedy trial).

Id. at 1332.

The Clinic, however, did not submit sufficient evidence to demonstrate that the EEOC had properly sent the first (undated) Notice to Friedman. Although the undated Notice does reflect that the EEOC copied Friedman with the Notice, the EEOC log states only that the Notice was "mailed to all party's [sic]."

again stated that he had 90 days in which to file suit; the second letter was a verbatim copy of the first, except for a new date. The parties agreed that under the applicable law the second letter was ineffective unless the EEOC had issued it after a reconsideration on the merits. Recognizing that there had been no reconsideration by the EEOC, this Circuit held that the second letter was ineffective and, accordingly, affirmed the trial court's dismissal of the ADEA claim as untimely.

On April 19, 1999, Plaintiff Roberta Santini responded to the Clinic's summary judgment motion, arguing that she had timely filed her federal claims. In support thereof, she submitted, inter alia, the affidavit of Elsa Santini (her mother), her own affidavit, and the affidavit of attorney Heidi Friedman.

In the mother's affidavit, Elsa Santini averred that "a postman for the United States Post Office delivered to my residence, 2812 North Atlantic Blvd., Fort Lauderdale, Florida 33308, a certified letter addressed to 2820 North Atlantic Blvd., Fort Lauderdale, Florida 33308 my daughter Roberta Santini's residence."[9] Elsa Santini Aff. at ¶ 3. She further averred that "at no time was I authorized by my daughter, Roberta Santini, to accept mail or packages delivered to my house addressed to my daughter's residence." Elsa Santini Aff. at ¶¶ 3, 4. Elsa Santini also stated that from December 17, 1997, when her husband of 52 years passed away, until late March or April 1998, she was under the care of a physician, who prescribed for her medication for anxiety and uncontrolled depression, and

---

[9] Elsa Santini did not further describe this certified letter, nor did she identify the date she had received it. But United States Postal Service Clerk Deona conducted a standard postal search for the return receipt of the EEOC's certified letter. The return receipt addressed to Roberta Santini at "2820 North Atlantic Blvd." had been signed for by "Elsa Santini" on January 29, 1998, and it identified the sender as "Employ Comm."

that she was "non-functional, either crying or sleeping." Elsa Santini Aff. at 5, 7. According to Elsa Santini, during this period, a non-English speaking caretaker attended to the household duties, including retrieving the mail. Elsa Santini Aff. at 5, 6.

In her own affidavit, Plaintiff Roberta Santini averred that she did not authorize her mother to accept mail or packages addressed to her residence but delivered to her mother's address. Roberta Santini Aff. at ¶ 2. She further averred that she did receive the March 2, 1998 Right-to-Sue Notice from the EEOC at her residence, that she relied on the representation therein that she had 90 days from receipt of that Notice to file suit, and that she relied on her attorneys to file her lawsuit within 90 days of that Notice. Roberta Santini Aff. at ¶¶ 3-6. Her affidavit omits any mention of her receiving the first Right-to-Sue Notice.

Additionally, on behalf of Roberta Santini, attorney Miller submitted a memorandum opposing summary judgment. He contended that Santini's suit was timely filed because the 90 day period did not begin to run until his client's receipt of the (second) March 2, 1998 Right-to-Sue Notice.[10]  Miller argued that it was undisputed that Elsa Santini had

---

[10]  In support of this argument, Miller relied on several former Fifth Circuit cases. These cases, however, are legally and factually distinguishable, involving a now invalid procedure whereby the EEOC would routinely send two letters notifying claimants of the status of their charges. See Hefner v. New Orleans Public Serv., Inc., 605 F.2d 893 (5th Cir. 1979)(explaining two-tiered EEOC procedure). See also Zamuto v. AT & T Co., 544 F.2d 1333 (5th Cir. 1977)(holding two-tier procedure invalid).  In these decisions, the courts held that the first letter, which would inform complainants they could request a right-to-sue letter, did not trigger the 90 day period; instead, the time commenced upon receipt of the second letter, a formal right-to-sue notice. See, e.g., Key v. Lumberjack Meats, Inc., 611 F.2d 602, 603 (5th Cir. 1980)(first letter informed plaintiff that the EEOC had been unable to obtain any remedy but upon his request he could obtain the right to file suit); Bernard v. Gulf Oil Co., 596 F.2d 1249 (5th Cir. 1979)(first letter informed plaintiffs that conciliation efforts had failed and that they could request a right-to-sue letter); Turner v. Texas Instruments, Inc., 556 F.2d 1349, 1350-51 (5th Cir. 1977)(first letter informed plaintiff that the EEOC could not achieve voluntary settlement but that the administrative process would continue).  Here, however, the first

received the earlier undated Right-to-Sue Notice at her residence and that her daughter had not authorized her to accept mail addressed to Roberta Santini, but delivered to her (the mother's) residence. He then stated, "Furthermore, Defendant has failed to produce any evidence that Plaintiff received the first Dismissal and Notice of Right-to-Sue Letter." Memorandum at 3 (DE 35). Miller contended that the undated Notice received by Elsa Santini did not start Roberta Santini's 90-day period. He argued that the decisions cited by the Clinic (in which the 90 day period was triggered by receipt of someone in the plaintiff's household) were factually distinguishable because the first (undated) Notice in this case was not delivered to Roberta Santini's residence and was not received by anyone in Roberta Santini's household. In arguing that the earlier undated Right-to-Sue Notice was ineffective, Miller cited Stallworth, 936 F.2d at 523-525.[11] Relying on Stallworth's pronouncement that "the primary fault for the failed delivery in this case rests upon the EEOC because of its failure to mail a copy of the Dismissal and Notice of Right to Sue Letter to Stallworth's attorney," id. at 525, Miller submitted an affidavit from attorney Heidi

---

Notice did not inform Santini merely that she could request a right-to-sue letter; rather, it constituted the formal right-to-sue notice. And unlike the second letter in the cases Miller relied on, Santini's second Notice was identical to the first, except for the date.

[11] In Stallworth, at the time plaintiff filed her discrimination charge, her attorney requested that the EEOC direct all communications and correspondence to him. Subsequently, the plaintiff's 25-year old nephew received a right-to-sue notice at plaintiff's permanent residence; he never gave the notice to the plaintiff, who had been temporarily residing at another address. Unaware of the nephew's receipt of the notice, the plaintiff, through her attorney, requested and received a second right-to-sue notice. The trial court dismissed the plaintiff's discrimination claim, holding that the 90 day period began to run from the nephew's receipt of the first notice. Reversing, this Circuit held that the plaintiff had satisfied her obligation to assume minimum responsibility to ensure receipt by checking for mail at her permanent address six times during the crucial month.

Friedman.  Friedman stated that she was Santini's attorney of record during the EEOC

process and investigation.  Friedman Aff. at ¶ 2.  She then averred, "The Affiant never

received from the EEOC the undated Right to Sue letter notwithstanding the affiants [sic]

name appearing on same.   However, the undersigned did receive from the EEOC the

Right to Sue letter dated March 2, 1998."  Friedman Aff. at ¶ 3.[12]

In his response memorandum, Miller additionally stated:

> It is undisputed by way of affidavit of attorney Heidi Friedman
> that she **did not** receive the [undated] Dismissal and Notice of
> Right to Sue Letter from the EEOC.  In fact, attorney Friedman
> by way of her affidavit states the only Dismissal and Notice of
> Right to Sue Letter she received from the EEOC was dated
> March 2, 1998.[13]

_____

[12]  The Court notes that the record contains no evidence that attorney Friedman
requested the EEOC to send all correspondence to her, as did the attorney in
Stallworth.

[13]  "Notice to the attorney who is formally representing the claimant before the
EEOC constitutes notice to the claimant and commences the running of the 90 days
allowed for the filing of a Title VII or ADEA action." Chapman v. Travalco, U.S.A., Inc.,
973 F. Supp. 1045, 1046 (S.D. Fla. 1997)(Graham, J.).  See also Irwin v. Dep't of
Veterans Affairs, 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990)(holding that
statutory period began to run on date right-to-sue notice was delivered to offices of
designated counsel or to claimant); Seitzinger v. Reading Hosp. and Medical Ctr., 165
F.3d 236, 239 (3rd Cir. 1999)("The statutorily-created ninety-day period starts when
either the claimant or her attorney receives a right-to-sue letter, whichever is earlier.");
Ringgold v. Nat'l Maintenance Corp., 796 F.2d 769, 770 (5th Cir. 1986)(holding that 90
day period begins to run "on the date that the EEOC right-to-sue letter is delivered to
the offices of formally designated counsel, or to the claimant," whichever is first;
Josiah-Faeduwor v. Communications Satellite Corp., 744 F.2d 1309, 1313-14 (7th Cir.
1984)(same).  In its summary judgment motion, the Clinic merely noted that its counsel
had received a copy of the undated notice and stated that under the presumption of
receipt upon mailing, see Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 148
n.1, 104 S.Ct. 1723, 1724 n.1, 80 L.Ed.2d 196 (1984), attorney Friedman was
presumed to have received the first Right-to-Sue notice on January 30, 1998.  The
Clinic did not argue that the 90 day period was triggered by Friedman's receipt because
Santini's mother had received the Notice on January 29, 1998, one day earlier.

11

Memorandum at 3 (DE 35)(emphasis in original).  Finally, Miller asserted, "Additionally, the facts are undisputed that Plaintiff's counsel, Heidi Friedman, only received one EEOC Dismissal and Notice of Right to Sue Letter dated March 2, 1998."  Memorandum at 6 (DE 35).[14]

The Clinic replied to Miller's arguments, contending that Santini had failed to create a genuine issue of material fact with respect to her receipt of the first (undated) Right-to-Sue Notice.  The Clinic pointed out that Santini had never denied receiving the Notice; rather, she had testified that she could not remember, was not legally trained, and probably would not have noticed the difference between the first (undated) Notice and the second (March) Notice.   With respect to Elsa Santini's affidavit, the Clinic noted that it merely recites that an unidentified postman once delivered an unidentified certified letter by leaving it with her at her residence.  Elsa Santini did not indicate that the letter she received was, in fact, an EEOC Right-to-Sue Notice.  Nor did she identify the date or even the year that the postman allegedly delivered the certified letter.

After reviewing the parties' submissions, the Court concluded that the record was not sufficiently developed to enable it to determine whether there existed a genuine issue of material fact as to Roberta Santini's alleged receipt of the first (undated) Right-to-Sue

---

[14] Miller also argued that "should this Honorable Court conclude that there is no genuine issue of material fact as to whether the [first, undated] Dismissal and Notice of Right to Sue Letter delivered to a residence other than Plaintiff's commenced the time period for Plaintiff to file suit, this Court should consider the application of equitable tolling."   Miller's equitable tolling argument was premised on Santini's purported reliance on the language of the March 2, 1998 Notice, informing her that she had 90 days from the receipt of that notice to file suit.  In the Order on Motion for Summary Judgment entered simultaneously herewith, this Court set forth in detail its reasons for rejecting the equitable tolling argument and dismissing the case.

Notice.  Although it appeared that Elsa Santini may have received the first Notice, conspicuously absent from her affidavit was any indication of whether she had given the Notice to her daughter.   Moreover, apparently standing by her deposition testimony, Roberta Santini failed to address in her subsequent affidavit whether she, in fact, had ever received the undated Right-to-Sue Notice from either the EEOC or her mother.  Consequently, the Court scheduled an evidentiary hearing and ordered that Elsa Santini, Plaintiff Roberta Santini, and attorney Heidi Friedman appear and provide testimony.[15]

On May 21, 1999, the Court commenced the evidentiary hearing.  Despite being ordered to appear, Plaintiff Roberta Santini failed to do so.  At the hearing, attorney Miller

---

[15]  This Court is aware that an evidentiary hearing on a summary judgment motion is not customary.  However, as the court in Waskovich v. Morango, 2 F.3d 1292 (3rd Cir. 1993), has stated:

> [A] district court may hold an evidentiary hearing at which it receives oral testimony, documents, and other evidence relating to a pending summary judgment motion, but it may not rely on the material submitted at such a hearing as a means of resolving any genuine issues of material fact.  Nor, of course, may it weigh the evidence submitted, judge the credibility of the witnesses who testified, or use the information it receives as a basis for making findings of fact, as all of these activities are incompatible with summary disposition of the case.

Id. at 1296.  See also Wilson v. West, 962 F. Supp. 939, 949 (S.D. Miss. 1997)(court held evidentiary hearing to develop factual record on equitable tolling issue); Thornton v. South Central Bell Tel. Co., 906 F. Supp. 1110, 1118 (S.D. Miss.1995) (Title VII case in which equitable tolling was issue; the court, after studying summary judgment materials, felt that it needed more, especially the in-court testimony of the plaintiff, her husband, and her physician).  In setting an evidentiary hearing, the Court was also mindful of the parties' desire to have the timeliness issue decided before conducting discovery directed to the merits of Santini's discrimination claims.  See Joint Motion to Stay Discovery (DE 38).  Neither party objected to the Court conducting the evidentiary hearing.  And the hearing ultimately revealed that no general issue of material fact existed as to Santini's receipt of the first (undated) Right-to-Sue Notice.

explained that Roberta Santini could not attend because she was unable to leave work. He stated that he would rely instead on Roberta Santini's deposition testimony and her affidavit. Elsa Santini and attorney Heidi Friedman did appear and testify at the hearing.[16]

Elsa Santini

Elsa Santini testified that she has lived at 2812 North Atlantic Boulevard, Fort Lauderdale, Florida for approximately 12 to 15 years, that her daughter (Roberta) has lived next door at 2820 North Atlantic Boulevard for 5 or 6 years, and that her daughter never authorized her to accept packages or sign for letters delivered by the United States Postal Service. Elsa Santini identified her signature on the January 29, 1998 return receipt but stated that she had no memory "whatsoever" of signing for any certified letter (despite having attested in her April 19, 1999 affidavit that a postman delivered to her residence a certified letter addressed to her daughter).[17] Elsa Santini additionally testified that after her husband's death in December 1997, she spent most of her time in bed on Valium and antidepressants, and, therefore, she would "definitely not" have been at her daughter's residence during this period of time. According to Elsa Santini, she never goes to Roberta's house when her daughter is not at home.

---

[16] Gloria Battle, the executive director of the BCHRD, and Dr. Marc Kaye, Santini's former supervisor, also testified. Battle's testimony related to whether Santini had exhausted her administrative remedies with respect to her state law claims, and Dr. Kaye's testimony related to whether the Clinic would be prejudiced by an equitable tolling of the 90 day period. Neither Director Battle's nor Dr. Kaye's testimony is pertinent here.

[17] Plaintiff Roberta Santini later testified that she was present when attorney Miller asked her mother whether she had signed for the first (undated) Right-to-Sue Notice. She testified that her mother "really didn't know anything about it. She didn't even know what you [Miller] were referring to." Transcript at 90-91 (DE 49).

Notwithstanding that Elsa Santini denied any recollection of the certified letter, she testified that she never gave it to Roberta Santini. When questioned about her normal practice of handling mail, Elsa Santini testified that during this time she would have placed any mail she had received on her desk but that the mail had accumulated and some of it had been thrown out. Elsa Santini further testified that her daughter (Roberta) would not have sorted through the accumulated mail because she was too busy. According to Elsa Santini, another daughter, Marie, visited from Ohio around Easter[18] and went through the accumulated mail, but Marie made no mention of a letter from the EEOC. Finally, Elsa Santini testified that neither her housekeeper nor anyone other than her other daughter (Marie) handled the accumulated mail.

Heidi Friedman[19]

Attorney Miller informed the Court that Heidi Friedman was present to testify but that he did not believe her testimony was necessary given the Clinic's reply memorandum. Miller explained that he had submitted Friedman's affidavit to counter the Clinic's suggestion in its summary judgment motion that receipt of the undated Right-to-Sue Notice by Friedman would trigger the 90 day period. He pointed out that the Clinic, in its reply memorandum, had abandoned that position, arguing only that it was the receipt by Plaintiff, and not counsel, that triggered the statutory period. Miller told the Court that he "just [did not] want to waste time in calling Ms. Friedman." Dissenting from this assessment of the

---

[18] The Court takes judicial notice that in 1998 Easter Sunday was April 12.

[19] Before the hearing, attorney Thomas F. Panza entered an appearance on behalf of Friedman; he was present at the hearing.

law,[20] the Court directed Friedman to testify.

Friedman has been practicing law in Florida since 1992.  Miller elicited from Friedman that she was Santini's attorney of record during the EEOC process.  Miller then inquired: "And could you tell us the date that you first received from the EEOC the right-to-sue letter, approximately when you received that from the EEOC?"  Friedman replied: "From the EEOC, approximately March 22, 1998."  Miller then clarified through the witness that the date of the Notice was March 2, not March 22.  This was the entirety of Miller's direct examination of Friedman.

On cross-examination, Friedman testified that both during the administrative proceedings and as of the date this lawsuit was filed, Miller was a partner and she was an associate at the same firm.  Miller was the partner primarily in charge of overseeing her work.  In 1998, Miller left the firm, although by that time Friedman had begun working for another partner in the office.  Friedman assumed that after she had ceased working on Miller's files, she would have continued to receive mail addressed to her, but she would have passed it on to Miller.

Friedman testified that by way of an August 12, 1997 letter, she had requested from the EEOC a right-to-sue notice; Miller signed the letter.  Friedman believed that she last worked on Santini's case in February 1998 when Miller asked her to call the EEOC to inquire about the Right-to-Sue Notice.[21]  According to Friedman, during this telephone

---

[20] See supra note 13.

[21]  Friedman initially testified that the EEOC representative with whom she had spoken was Bob Mataxa.  She later corrected her testimony, stating that she had actually spoken with Jeffrey Woods and that the conversation had taken place on January 26, 1998 (the day before the EEOC had sent the first (undated) Notice), not in

conversation she informed the EEOC representative that she had not received a right-to-sue notice; the representative responded that they "will get right on it." Friedman also recalled later receiving the March 2, 1998 Notice, which she gave to Miller.

Friedman acknowledged that she had reviewed her firm's file on the Santini case before her testimony; she, however, did not bring the file with her. When defense counsel inquired whether she had observed the undated (first) Right-to-Sue Notice in the file, Miller objected, asserting the attorney-client and work product privileges. Over Miller's objections, the Court directed Friedman to answer. She proceeded to admit that the firm's file did contain the undated (first) Notice. Defense counsel asked no further questions. And Miller posed no questions on redirect.

The Court then inquired. Friedman acknowledged that Roberta Santini had forwarded to her attention the undated (first) Notice and that she had had a telephone conversation with Santini about that Notice in February 1998. The Court next inquired of Friedman whether that conversation with Santini occurred before or after her call to the EEOC. Friedman responded, "It was really around the same time because it is the last things, those were the last 2 things that I did on the file." Transcript at 65 (DE 50).

The Court then invited follow-up questions from counsel. Miller declined the invitation. Defense counsel, however, accepted. He referred Friedman to her affidavit, in which she averred that she had not received the undated Right-to-Sue Notice from the EEOC. He asked: "And as I now understand what from your testimony, while you didn't receive it from the EEOC your firm received it from your client?" Friedman responded: "My

---

February 1998.

firm but not me necessarily.  From the client, not from the EEOC."  Transcript at 66 (DE 50).

At the conclusion of the testimony, the Court informed counsel that it would reconvene the hearing with Plaintiff Roberta Santini present.  It instructed Miller to speak to his client and then inform the Court and defense counsel whether he intended to continue to litigate the issue of Roberta Santini's receipt of the first (undated) Notice and the timeliness of her federal claims.  Attorney Miller responded that because he was no longer with his former firm, he would "need to go and take a look at the documents and see what everybody is talking about and discuss that so I can make that determination fairly quickly, I guess."  Transcript at 95-96 (DE 50).

The Court set the continued hearing for June 1, 1999.  Approximately one hour before the hearing, attorney Miller informed Chambers that he was no longer contesting whether Plaintiff Roberta Santini had received the first (undated) Right-to-Sue Notice but that he would continue to argue that the filing period be equitably tolled.  After he reiterated this position at the beginning of the hearing, Miller again objected to Friedman's continuing to testify about the first (undated) Notice; he argued that her testimony on the issue was no longer relevant.  The Court overruled Miller's objection, whereupon Friedman, Santini, and Miller provided the following testimony:

1.  On January 26, 1998, Friedman called Jeffrey Woods, an EEOC representative, and informed him that she had not yet received a right-to-sue letter.  Her handwritten notes memorializing this conversation state: "Telephone conversation with Jeff Woods, EEOC, Right to Sue Letter should be sent.  Just needs signature."  Friedman stated that she mistakenly testified at the May 21, 1999 hearing that this conversation was with Bob

18

Mataxa in February 1998. This is the only telephone conversation Friedman recalls having had with any EEOC representative. Further, her time entries do not reflect any other conversation, and she does not have any notes reflecting another conversation.

2. On or before February 2, 1998, Plaintiff Roberta Santini did receive from the EEOC the first (undated) Right-to-Sue Notice. She then called Friedman to notify her that she (Roberta Santini) had received the Notice. Friedman informed Santini that she (Friedman) had not received it. The law firm's time records reflect a February 2, 1998 telephone conversation between Friedman and Santini. Santini immediately faxed the Notice to the firm. The faxed copy of the first (undated) Notice bears a fax date of February 2, 1998, and it contains the following notation by Santini: "To Heidi Friedman, Esq. from Roberta Santini, M.D." Friedman testified that she does not recall either the conversation with Santini or receiving the faxed Notice. She further testified that had she received the faxed Notice, she would have given it to Miller because she was no longer working on Santini's case.

3. Miller testified that he does not recall receiving the first (undated) Notice, which was faxed by Santini. Yet, the law firm's time records reflect that on the day Santini faxed the Notice, Miller expended thirty (30) minutes on "[r]eceipt and review of right to sue letter; follow up on same." In addition, the law firm's file on the Santini case contains a February 1998 memorandum from Miller to Justin Senior, an associate at the firm. The memorandum's content makes apparent that it was drafted between February 2 and February 13, 1998.[22] The memorandum states:

---

[22] Although the memorandum is dated February 27, 1998, the computer records submitted by Friedman with her post-hearing memorandum indicate that the memo-

> We received the right to sue letter on February 2, 1998, from our client. I am uncertain as to the exact date that it was filed. In any event, please prepare a complaint for sexual harassment, constructive discharge, negligent supervision and retention and any other causes of action which you believe are pertinent. I would like to have the complaint drafted by February 13, 1998. Also please see Heidi on this matter as she worked on the EEOC portion of the case.

February Memorandum (Defendant's Hearing Exhibit 3). Miller testified that he does not recall whether he made the time entry[23] or whether he drafted the memorandum. But he stated that it is his practice to sign any memorandum across the top, and this memorandum does not contain his signature. According to Miller, at times another partner would dictate a memorandum for him after they had discussed a case. [24] Santini testified that she did not speak to Miller about receiving the first (undated) EEOC Notice.

4.   On June 4, 1998, Miller left the law firm, but he continues to represent Santini in this lawsuit.

5.   Before preparing his response to the Clinic's March 22, 1999 summary judgment motion. Miller called Friedman and asked whether she had received the first (undated) Right-to-Sue Notice from the EEOC. Miller testified that he also asked her to provide an affidavit to counter the Clinic's assertion that an attorney's receipt of a right-to-sue notice

---

randum was actually prepared on February 3, 1998; the February 27 date was a typographical error.

[23] Friedman, however, submitted with her post-hearing memorandum Miller's handwritten time sheet reflecting that he had, in fact, prepared the time entry.

[24] With his post-hearing memorandum, Miller submitted the affidavit of his secretary, Shari Levine. Although Levine avers that Miller was out of the office at the time the memorandum to Justin Senior was prepared, she further avers that Miller had directed her (by telephone) to prepare the memorandum to Senior.

would trigger the 90 day period.

6    Two weeks later.[25] Miller met with Friedman at her law office to discuss and prepare her affidavit. Friedman's firm - Miller's former firm - had kept its file on the Santini case. During their review of this file, Miller and Friedman examined the first (undated) Right-to-Sue Notice that Santini had faxed to the firm on February 2, 1998, and the February 1998 memorandum from Miller to Justin Senior. Miller testified that when he observed this Notice in the file, he was surprised and shocked and his "heart went into [his] stomach." Transcript at 121 (DE 49).

7.    Miller subsequently called Santini two or three times to discuss the first (undated) Notice in the law firm's file. Santini testified that she remembered receiving the undated Notice only after Miller informed her that he had seen her faxed copy in his former firm's file.

8.    After reviewing the undated Notice in the file, Miller telephoned Friedman several times and asked whether she could still furnish an affidavit, just indicating the date on which she received from the EEOC a right-to-sue notice. Miller then sent her a proposed affidavit. Friedman discussed the language of that affidavit with several partners in her firm, and they redrafted it. Friedman then provided the affidavit to Miller, knowing that it was to be used in response to the Clinic's summary judgment motion. Friedman stated that she and Miller discussed whether her affidavit fully and fairly put before the Court the facts of which she had knowledge. Friedman conceded that as an employment discrimination lawyer she was aware of the legal significance of the first (undated) Right-to-

---

[25] According to Friedman's supplemental memorandum, this meeting occurred on April 9, 1999. Miller has not disputed the date.

Sue Notice received by Santini.  But she stated that she does not believe that her affidavit set forth only a partial truth, notwithstanding its omitting that both Santini and her counsel had, in fact, received the first (undated) EEOC Notice.  According to Friedman, Miller and another attorney in his current firm had informed her they were going to argue that the filing period be equitably tolled based on the receipt of the second EEOC Notice.  She claimed that this was the only issue they had asked her to address.  Friedman testified she was unaware that Miller was going to represent to the Court that they had not received the first (undated) Notice.  Yet. she acknowledged that she was aware that Miller was going to argue that the first (undated) Notice was ineffective because it had been delivered to the wrong address and received by Santini's mother.  Friedman further acknowledged that she had briefly reviewed Miller's response before the hearing to see how her affidavit had been used.

9.  Miller admitted that as an officer of the Court he knew that the Federal Rules of Civil Procedure required him to supplement his disclosures  to defense counsel.  But he stated that he had not thought to do so with respect to the evidence he encountered showing his and Santini's receipt of the first (undated) Notice.

10.  Roberta Santini testified that she did not appear at the May 21, 1999 hearing because she had difficulty finding someone to cover for her at work; she had already missed one day of work the previous week to attend the deposition of Dr. Kaye.  According to Santini, she was unaware of the Court's May 12, 1998 Order, which stated, "Plaintiff shall appear at the hearing and give testimony."  She testified that she had asked her attorney (Miller) whether she was required to attend, and he had informed her it was not necessary.  Santini further testified that nobody had suggested or advised that she not

attend the hearing. Attorney Miller acknowledged that he had, in fact, informed Santini that she need not attend the hearing. According to Miller, he had misread the Court's Order and did not realize that Santini was required to attend. But he had ensured Friedman's attendance, as ordered, by having her served with a subpoena; he also ensured Elsa Santini's attendance, as ordered.

10. Santini testified that she did not recall receiving the first (undated) Right-to-Sue Notice until after she had signed her April 19, 1999 affidavit.

At the conclusion of the hearing, the Court directed the parties and attorneys Miller and Friedman to submit memoranda addressing whether sanctions should be imposed against attorney Miller, attorney Friedman, and/or Plaintiff Santini for concealing from the Court and the Clinic the actual receipt by both Santini and her counsel of the first (undated) Right-to-Sue Notice.

<u>SANCTIONS</u>

The law provides the Court with several alternatives by which to levy sanctions against attorneys and/or parties for abusive litigation tactics. Under Federal Rule of Civil Procedure 11, by "signing a pleading in a federal court, an attorney [and/or party] certifies that he or she has conducted a reasonable inquiry and that the pleading is well grounded in fact, legally tenable, and 'is not presented for any improper purpose.'" <u>Baker v. Alderman</u>, 158 F.3d 516, 524 (11th Cir. 1998)(quoting Fed. R. Civ. P. 11). Under Rule 11, a court may impose sanctions where a party or attorney has signed and filed a pleading that "(1) has no reasonable factual basis; (2) is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; and (3) is filed in bad faith for an improper purpose." <u>Id.</u> "The

23

objective standard for testing conduct under Rule 11 is 'reasonable under the circumstances' and 'what was reasonable to believe at the time' the pleading was submitted." Id. Sanctions may also be warranted where an attorney and/or party "exhibits a deliberate indifference to obvious facts." Id. (internal quotations omitted). Rule 11 imposes an obligation to "make a reasonable inquiry into both the legal and factual basis of a claim. . . ." Worldwide Primates, Inc. v. McGreal, 87 F.3d 1252, 1255 (11th Cir. 1996).

Additionally, under 28 U.S.C. § 1927, a court may require attorneys who unreasonably and vexatiously multiply the proceedings to pay any excess costs, expenses, and attorneys' fees incurred on account of such misconduct.[26] An award of sanctions under § 1927 must satisfy three "essential requirements": "First, the attorney must engage in 'unreasonable and vexatious' conduct.[27] Second, that 'unreasonable and vexatious' conduct must be conduct that 'multiplies the proceedings.' Finally, the dollar amount of the sanction must bear a financial nexus to the excess proceedings, i.e., the sanction may not exceed the 'costs, expenses, and attorneys' fees reasonably incurred because of such conduct.'" Peterson v. BMI, 124 F.3d 1386, 1396 (11th Cir. 1997).

---

[26] Title 28 U.S.C. § 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

[27] "[T]he test for whether conduct is 'vexatious' under Section 1927 is whether it is objectively harassing or annoying so that it reflects a serious and studied disregard for the orderly process of justice. " An-Port, Inc. v. MBR Industries, Inc., 142 F.R.D. 47, 49 (D. P.R. 1992).

24

Moreover, a court retains an even broader inherent power derived from the common law to impose sanctions against attorneys and parties who conduct litigation in bad faith. Chambers v. NASCO, Inc., 501 U.S. 32, 44, 111 S.Ct. 2123, 2132-33, 115 L.Ed.2d 27 (1991); Roadway Express, Inc. v. Piper, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). See Malautea v. v. Suzuki Motor Company, Ltd., 987 F.2d 1536, 1545 (11th Cir.) ("[D]eeply rooted in the common law tradition is the power of any court to manage its affairs which necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it.  Courts' inherent power also extends to parties to litigation.")(internal quotations omitted), cert. denied, 510 U.S. 863, 114 S.Ct. 181, 126 L.Ed.2d 140 (1993).   See also Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998)("The key to unlocking a court's inherent power is a finding of bad faith.").  "In the exercise of its inherent powers, a court may tax costs and attorneys' fees "for bad faith action taken in the conduct of litigation, even it the litigation itself is not in bad faith." Bower v. Weisman, 674 F. Supp. 109, 112 (S.D.N.Y. 1987).

This Court must determine whether sanctions against attorney Miller, Plaintiff Roberta Santini, and/or attorney Friedman are warranted and, if so, the nature thereof and the bases upon which they should be imposed.

### Attorney Miller

From the inception of this lawsuit, attorney Miller has repeatedly failed to disclose to the Court and to the Clinic that Plaintiff Roberta Santini and her counsel had, in fact, received an EEOC Right-to-Sue Notice more than 90 days before he filed her Complaint. The record is clear that Miller knew by February 2, 1998, that Santini had personally received the first (undated) Right-to-Sue Notice.  Miller had not only reviewed the Notice,

25

but had also prepared (or caused to be prepared) a memorandum to an associate directing

that a complaint be drafted by February 13. 1998.  Yet. in the Complaint. Miller made no

reference to either Santini's or counsel's receipt of the first Notice; he instead attached to

the Complaint only the second (March 2, 1998) Notice.  Miller claims that by the time he

had filed the Complaint four months later on May 29, 1998, he had forgotten that he and

Santini had both received the first Notice.  But even if this Court were to accept Miller's

claim, he was nonetheless under a duty to conduct a reasonable inquiry or investigation

before filing suit.  Had he merely reviewed his own case file before signing the Complaint,

he would have seen not only the first (undated) Notice, but also his own memorandum

directed thereto.  Taking the evidence in the light most favorable to Miller, his filing this

action without disclosing Santini's receipt of the first (undated) Notice manifests a reckless

disregard of his duty of reasonable inquiry.

Furthermore, less than two months after he filed this action, Miller was alerted to the

existence of the earlier Notice.  On July 24, 1998, in its First Amended Answer, the Clinic

asserted that Santini had failed to meet the jurisdictional time requirements for filing suit.

But rather than review his own file to ensure the timeliness of his action, Miller moved the

Court to strike the Clinic's affirmative defenses.  In response to that motion, the Clinic more

specifically articulated the basis for its defense:

> Plaintiff has attached to her complaint a right-to-sue letter that
> appears to be dated March 2, 1999.  Defendant, however,
> received a copy of the right-to-sue letter on February 3, 1998,
> which would render her suit untimely filed.   Defendant
> therefore has good reason to believe the federal claims are
> untimely.

Defendant's Memorandum at 9 (DE 21).  Clearly, this response should have prompted

Miller to conduct a reasonable inquiry to determine whether he and/or Santini had, in fact, received an earlier Notice.

The following month, Miller again was presented an occasion to review his file and confer with his client.  On August 13, 1998, the parties filed a Joint Proposed Scheduling Order (signed by Miller) in which they agreed to exchange "all documents then reasonably available to each party which are then contemplated to be used in support of the allegations of the pleading filed by the party" and "any other evidence reasonably available."  Miller, however, did not produce to the Clinic the first (undated) Notice.  His failure to do so manifested, at best, a continuing indifference to his duty of reasonable inquiry or, at worst, a willful concealment of a critical discovery document.

The following month, Miller was yet again presented an occasion to investigate his receipt of the first Notice.  On September 14, 1998, the Clinic noticed Santini's deposition, requesting that she produce all documents she had received from the EEOC.  At her deposition, she purportedly produced all EEOC documents in her possession; the first (undated) EEOC Notice, however, was not contained within the file she produced.  When the Clinic showed Santini its own copy of the first (undated) Notice, she could not recall receiving it.  Miller maintains that in preparing for the deposition he and Santini spent weeks reviewing several cartons of documents, yet he claims that they did not come across the first (undated) Notice.[28]  And he contends that at no time did he and Santini discuss her

---

[28] According to the Clinic, on September 11, 1998, it served on Miller a list of exhibits, as required by Local Rule 16.1(B), together with copies of documents, including the first (undated) Right-to-Sue Notice.  Miller, therefore, would have possessed the Clinic's copy of the undated Notice at the time he and Santini prepared for her deposition.  At the June 1, 1999 hearing, Miller testified that when the Clinic produced the discovery documents, he merely "flipp[ed] through" them, but "there was

receipt of that (first) Notice.  But were Miller's contention to be credited, it would only underscore his failure to conduct a reasonable inquiry.  By this time (September 1998), he had clearly been placed on notice that the EEOC had issued a Right-to-Sue Notice in January 1998.  And Miller knew from the Clinic's pleadings that Santini's receipt of that Notice would be a primary area of inquiry at her deposition.  Yet, by Miller's own contention, he did not even raise the matter with his client

But even assuming that Miller did not recall his and/or Santini's receipt of the first (undated) Notice until he reviewed the file on April 9, 1999, the Court would have no doubt that Miller thereafter deliberately concealed this material evidence.  As an experienced employment discrimination litigator, Miller knew that his and Santini's February 2, 1998 receipt of the EEOC Notice called into question the timeliness of her Title VII and ADEA claims.  Indeed, Miller testified that upon his encountering the first Notice in the files, his "heart went into his stomach."  Transcript at 121 (DE 49).  But rather than promptly disclosing his April 9, 1999 "discovery" of the first Notice (and possibly arguing for an equitable tolling or proceeding on the state law claims only), Miller chose a course of deception.

Miller commenced this course of deception with his response memorandum, in which he argued that the 90 day period began to run on March 2, 1998.  Yet, his memorandum contained the glaring omission that both he and Santini had, in fact, received the first (undated) Notice by February 2, 1998.  He remained silent as to this material fact knowing that it was critical to the proper resolution of the dispute.  But his tactics went

---

[not] much in reviewing the documents" because they consisted mainly of the same documents he had produced to the Clinic.  Transcript at 127-28 (DE 49).

beyond material omission; he engaged in disingenuous argument: "Furthermore, Defendant has failed to produce any evidence that Plaintiff received the first Dismissal and Notice of Right to Sue Letter." Memorandum at 3 (DE 35). Miller made this argument knowing that the only reason the Clinic had failed to produce the evidence was because he (Miller) had failed to tender it, though the Clinic had requested it in discovery, and because his client (Santini) had failed to retain it in the file she produced to opposing counsel or to disclose it in her affidavit or deposition. Even more egregiously, his memorandum included statements that, if not completely false, were grossly misleading. As structured by Miller, such statements contain elements of truth, but when read as a whole and considered in context they convey a false impression: "Additionally, the facts are undisputed that Plaintiff's counsel Heidi Friedman, only received one EEOC Dismissal and Notice of Right to Sue Letter dated March 2, 1998." Memorandum at 6 (DE 35). Miller knew that although "Plaintiff's counsel Heidi Friedman" could not recall having received the first (undated) Notice, a matter that is disputed by his client's own testimony, Friedman's law office and, in particular, Plaintiff's other counsel (Bartley Miller) had received the earlier (undated) Notice. Because the law only requires receipt by counsel's office, not by counsel personally, Irwin, 498 U.S. 89, 93, 111 S.Ct. 453, 456, Miller's insertion of Friedman's name served only to add an irrelevant truth to a misleading statement. And the misleading statement was calculated to have this Court draw the inference that Plaintiff's counsel had only received one Notice - an inference that Miller knew to be false.

Miller then extended his deception to his presentation of evidence. To avoid summary judgment, Miller submitted the affidavits of Elsa Santini and Heidi Friedman, both of which were calculated to conceal the truth from the Court. In her affidavit, Elsa Santini

averred that the Postal Service delivered to her residence a certified letter addressed to Roberta Santini and that her daughter had never authorized her to accept delivery.  Elsa Santini also related that she was depressed, taking medication, and non-functional following the death of her husband and that a non-English speaking housekeeper was taking care of such daily activities as gathering the mail.  Miller's clear implication was that neither Elsa Santini nor the housekeeper realized the importance of the certified letter and, accordingly, they did not give it to Roberta Santini.  Not only was this affidavit misleading, it went beyond that to which Elsa Santini could truthfully attest.  At the May 21, 1999 hearing, Miller called this lady as a witness.  In response to Miller's questioning, Elsa Santini testified that she could not actually recall receiving the certified letter or signing for it at her residence.  Moreover, attorney Miller sat silently by and permitted Elsa Santini to testify unequivocally that she had never given the Notice to her daughter, knowing that either she or someone in her household had, in fact, given it to Roberta Santini.

Even more troubling than his passivity in the face of Elsa Santini's testimony was Miller's submission to the Court of Heidi Friedman's affidavit.  In this document, Friedman averred that she did not receive "from the EEOC" the undated Right-to-Sue letter, but that she did receive from the EEOC the Right-to-Sue letter dated March 2, 1998.  Miller submitted this affidavit to the Court knowing that even though Friedman had not received the first (undated) Notice from the EEOC, she had received it from Roberta Santini. As an experienced employment discrimination litigator, Miller knew that Friedman's immediate source of the document is immaterial, the law requiring only that counsel receive the Notice to trigger the 90 day period.  See supra note 13.  Accordingly, Miller's submission of an affidavit containing the phrase "from the EEOC," like his memorandum

30

statements, could only have been calculated to supply a grain of irrelevant truth to a statement that when read as a whole and taken in context is grossly misleading.

Miller continued to conceal the receipt of the first Notice at the May 21, 1998 hearing. Miller had advised Santini that her appearance at that hearing was not necessary, notwithstanding the Court's unambigous Order that she appear to testify. Miller claims that he misread the Order as to Roberta Santini (but not as to Elsa Santini or Heidi Friedman). His advice prevented Santini from appearing and acknowledging her receipt of the Notice. Moreover, at that hearing, Miller informed the Court that because Roberta Santini was not present he was "willing to stand by" her deposition testimony and affidavit, even though Santini had testified that she did not recall receiving the first (undated) Notice and her affidavit did not address the issue. Miller then attempted to prevent Friedman (who was also aware of Santini's and counsel's receipt of the first Right-to-Sue Notice) from testifying. Miller told the Court that he did not believe her testimony was necessary because the Clinic had abandoned its argument that receipt by a plaintiff's attorney would trigger the 90 day period. The Court, however, directed Friedman to testify.

Miller then called Friedman as a witness. Through careful questioning, he avoided eliciting from Friedman any response indicating that Santini had, in fact, received the first Notice and that he (Miller) had received it from Santini and reviewed it on February 2, 1998. And on the Clinic's cross-examination, Miller attempted to prevent Friedman from testifying that the first (undated) EEOC Notice was in the law firm's file by asserting the attorney-client and work product privileges.

Additionally, after Friedman finally revealed that Santini had, in fact, received the first (undated) Notice, the Court instructed Miller to notify the Court and defense counsel

31

whether he intended to litigate the timeliness of Santini's Title VII and ADEA claims.[29]
Miller continued to create a misleading impression, telling the Court that because he was
no longer with his former firm, he would "need to go and take a look at the documents and
see what everybody is talking about and discuss that so I can make that determination
fairly quickly, I guess."  Transcript at 95-96 (DE 50).  Miller made this statement to the
Court well knowing "what everybody [was] talking about."  As this Court later learned at the
continued hearing, Miller had already reviewed the file (on April 9, 1999) and examined the
documents showing not only that Santini, but that he himself had received the undated
Notice on or about February 2, 1998.

In defense of his conduct, attorney Miller first argues that he should not be
sanctioned because even though he did know that Santini had received the first (undated)
Notice on or about February 2, 1998, he was advancing what he believed to be a legally
tenable argument - the 90 day filing period did not begin to run at that time due to the
Postal Service's improper delivery of that first Notice to Santini's mother.  Miller, however,
admits that after researching the issue he found no authority to support his argument.  And,
in fact, he resorted to citing legally and factually dissimilar cases involving now invalid
EEOC procedures that were not utilized in this case.  That Miller found no support for his
argument is not surprising; the operative fact as to the timeliness of a Title VII/ADEA action

---

[29] The Court was still unable to determine whether Santini had (un)timely filed
her federal claims because Friedman claimed that she could not then testify as to the
precise date Santini and counsel had received the first Notice.  She stated only that she
had had a conversation with Santini about the first Notice in February.  Had Santini
received that Notice on February 28, 1998, her claims would still have been timely.
Accordingly, the Court continued the hearing and, again, directed that Roberta Santini
be present; it also directed Friedman to appear at the continued hearing with her file so
that the Court could ascertain the precise date of receipt.

is the complainant's receipt of the notice, not the manner of its delivery, as Miller, an experienced employment law attorney, well knew.[30] Furthermore, his argument would have the Court disregard that he too received the first Notice, an event that by itself would trigger the 90 day period. The Court can only conclude that Miller devised the argument, without any legal support, to justify his concealing their actual receipt of the first Notice and to avoid the entry of summary judgment.

Miller additionally argues that sanctions are not warranted because he believed that the attorney-client privilege shielded from disclosure Santini's fax transmittal of the first Notice to his law firm and, therefore, his producing the document "would have breached his ethical duties as Plaintiff's advocate." Plaintiff's June 18, 1999 Memorandum at 4 (DE 52). The attorney-client privilege "protects the disclosures that a client makes to his attorney, in confidence, for the purpose of securing legal advice or assistance." Cox. v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1414 (11th Cir. 1994), cert. denied, 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995). The privilege, however, "does not embrace everything that arises out of the existence of an attorney-client relationship." United States v. Pipkins, 528 F.2d 559, 563 (5th Cir.), cert. denied, 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976). As the former Fifth Circuit explained:

> The attorney-client privilege . . . is not a broad rule of law which interposes a blanket ban on the testimony of an attorney. To the contrary, . . . the privilege stands in derogation of the public's "right to every man's evidence" and as "an obstacle to the investigation of the truth"; thus as Wigmore has said, "It ought to be strictly confined within the narrowest possible limits

---

[30] Miller's argument may have been tenable had neither he nor Santini received the first Notice due to the improper delivery. But, as Miller was ultimately forced to acknowledge, the facts are otherwise.

consistent with the logic of its principle."

Id. at 562-63 (internal citations omitted).   "It is vital to a claim of privilege that the communication have been made and maintained in confidence.  Thus courts have refused to apply the privilege to information that the client intends to impart to others." Id. at 563. See also, United States v. Aronson, 781 F.2d 1580, 1581 (11th Cir. 1986)(attorney-client privilege not applicable to documents that "by their very nature contemplate disclosure to third parties"). [31]

In his June 18, 1999 memorandum, attorney Miller contends that "Dr. Santini testified during the June 1, 1999 hearing on P. 75 L. 9 thru 22, that this document was sent to Attorney Friedman in order to obtain legal advice regarding the validity of the first, undated Right to Sue Letter." Memorandum at 8 (DE 52).    Miller, however, mischaracterizes Santini's testimony.   Her referenced testimony was as follows:

> Q.  Wouldn't it be accurate to say that at your deposition you recalled that the March 2nd Letter, 90-day Letter attached to the Complaint wasn't the one you received?
>
> A.  No, that's the one I found in my file.  The March 2nd one was the one that I did find at home in my file, and that was the one that I – that I was following because I was told that the original one – that now, I mean, we are finding the faxed copy in the attorney's files.  That one was the one that I was told was not valid because it had been sent out incomplete.  So it was incomplete and they said, "Well, just ignore that one and wait until we send you the complete one which should becoming [sic] in the next couple of weeks."  And that's – that's the one that I received, I don't know what the date – March 2nd I think was the date or March – the beginning of March.

---

[31]  In Florida, the attorney-client privilege has been codified:  "A communication between lawyer and client is 'confidential' if it is not intended to be disclosed to third persons . . . ." Fla. Stat. § 90.502(1)(c).

Transcript at 75 (DE 49).

Santini further testified about faxing the February 2, 1998 Notice to Miller's law firm:

> Then I remembered what happened, because – actually I kind
> of recall what happened. I was on the phone with Heidi, and
> I had called – I had called her because I said I had received
> this letter from the EEOC and I asked her, "Did you receive it?"
> And she said, "No."
>
> She said, "Well" – said. "Well, shall I fax it to you?" and she
> said, "Yeah, fax it right away." And so I said, "Look, I am going
> to fax it right to you." So I didn't even put, you know, a fax
> cover sheet or anything.
>
> I said, "I'm just going to be faxing it right now." So on the very
> top of it I just put, "To Heidi Friedman from Roberta Santini,"
> and quickly faxed it to her."
>
> Shortly thereafter, I don't know if it was a day or two or a
> couple of days maybe, she called me back to tell me just
> disregard that one because it was definitely incomplete, that
> the EEOC had sent it out incorrectly and to disregard it.

Transcript at 77 (DE 49).

At no time did Santini ever testify that she had faxed the Notice to her attorney to obtain legal advice. Moreover, there is nothing in the record to suggest that Santini intended to shield her receipt of the Notice from third parties when she faxed the document to her attorneys. Indeed, had she requested that her attorneys shield the fact that she had received the first Notice she would have been suggesting a fraud upon the Court. Receipt of an EEOC right-to-sue notice is a prerequisite to filing a Title VII/ADEA action and is not a confidential communication between client and counsel. The attorney-client privilege does not even colorably apply. Miller could not have possessed a good faith belief that the privilege would shield from the Court and the Clinic evidence of Santini's receipt of the

Notice.[22]  Indeed, he never even raised this argument until after the Court learned that he had withheld the first (undated) Notice.  His after-the-fact rationalization is not persuasive.

Finally, Miller offers a "literal truth" defense to his tactics.  He testified:  "But I thought I was very careful in not saying that she didn't get it, that the letter was sent to the mother's house and the mother signed for it.  So I thought I was being very careful in not telling the Court that she in fact didn't get it."  Transcript at 122 (DE 49).  He continued:  "At the time I wrote the memorandum of law in response I made sure I did not say in there, affirmatively did not say that Dr. Santini did not get that right-to-sue letter."  Transcript at 125 (DE 49).  And, in his post-hearing memorandum, he continued to assert that he never affirmatively stated that Santini did not receive the Notice.  But while a "literal truth" defense may be an appropriate response for a criminal defendant answering a perjury indictment, see Bronston v. United States, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), it is an unacceptable response for an attorney called to account for his litigation tactics; officers of the court are held to a far higher standard.  Such calculated efforts to skirt the bounds of perjury - a material omission here, a truthful, but misleading assertion there - serve only to debase the legal profession.[33]

As this Circuit has explained:  "All attorneys, as 'officers of the court,' owe duties of complete candor and primary loyalty to the court before which they practice.  An attorney's duty to a client can never outweigh his or her responsibility to see that our

---

[32]  An attorney harboring a genuine belief that a legal privilege shields disclosure of a document must expressly assert the privilege at the time the document  is requested.  See Fed. R. Civ. P. 26(b)(5).  Miller never asserted any claim of privilege.

[33]  See infra note 38 for citations to ethical proscriptions.

36

system of justice functions smoothly." Malautea, 987 F.2d at 1546. And, as articulated by

another court, this duty is fundamental to preserving the integrity of the judicial process:

> Our adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the system's process which is designed for the purpose of dispensing justice. However, because no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent and custom, and argument to reasoned conclusions--all directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition. Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process. . . . While no one would want to disagree with these generalities about the obvious, it is important to reaffirm, on a general basis, the principle that lawyers, who serve as officers of the court, have the first line task of assuring the integrity of the process. . . . The system can provide no harbor for clever devices to divert the search, mislead opposing counsel or the court, or cover up that which is necessary for justice in the end. It is without note, therefore, that we recognize that the lawyer's duties to maintain the confidences of a client and advocate vigorously are trumped ultimately by a duty to guard against the corruption that justice will be dispensed on an act of deceit.

United States v. Shaffer Equip. Co., 11 F.3d 450, 457-58 (4th Cir. 1993).

Miller breached his duty of candor to this tribunal. He deliberately structured his

memorandum, affidavits, and witness testimony to create a false impression with the Court.

By employing such "clever devices to divert the search, mislead opposing counsel or the

court, or cover up that which is necessary for justice in the end," Miller's conduct fell far

below the ethical standards to which this Court - indeed, any court - expects its officers to

adhere. Id.

Further, by intentionally engaging in a pattern of obfuscation, Miller unreasonably

and vexatiously multiplied these proceedings. See 28 U.S.C. § 1927. Miller knew of both

his and Santini's receipt of the first (undated) EEOC Right-to-Sue Notice at the latest by April 9, 1999, the date he and Friedman reviewed the file;[34] yet, he thereafter intentionally concealed this material fact from the Court and the Clinic. Had the Court not taken the unusual step of conducting an evidentiary hearing on the Clinic's summary judgment motion, undoubtedly this information would never have come to light. Miller's deception required the Clinic's counsel to reply to Miller's spurious legal arguments, to travel from Washington, D.C., to Fort Lauderdale, Florida, on two occasions to attend hearings on the issue, and to again brief the issues following the hearings. In addition to causing the Clinic to incur additional, unnecessary expense, his conduct delayed these proceedings and wasted valuable judicial resources. See Bonfiglio v. Nugent, 986 F.2d 1391, 1394 (11th Cir. 1993)("Flagrant abuse of the judicial process can enable one person to preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants.").

Although this Circuit has not elaborated upon the standard to be applied in imposing § 1927 sanctions,[35] it has stated that the statute permits a court to impose such sanctions

---

[34] The Court is not persuaded by Miller's assertion that he first became aware of or remembered his and Santini's receipt of the first EEOC Notice on April 9, 1999. But even if true, it would not have relieved him of his obligation to conduct a reasonable inquiry at several earlier points in the litigation. Nonetheless, in assessing the appropriate sanction, the Court will grant Miller the benefit of every reasonable doubt - and more. Accordingly, this Court will not require that he compensate the Clinic for the fees and expenses it incurred prior to April 9, 1999.

[35] Some circuits require a finding of objective bad faith or reckless conduct on the part of counsel before invoking § 1927, while others require only that counsel acted unreasonably or vexatiously. See, e.g., MGIC Indem. Corp. v. Moore, 952 F.2d 1120, 1122 (9th Cir. 1987)(bad faith); Braley v. Campbell, 832 F.2d 1504, 1510 (10th Cir. 1987)(unreasonable conduct); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc., 809 F.2d 626, 638 (9th Cir. 1987)(bad faith or reckless conduct); Oliveri v. Thompson,

against attorneys "who willfully abuse the judicial process by conduct tantamount to bad faith." Malautea, 987 F.2d at 1544 (holding that concealment of discovery materials warrants sanctions under § 1927 and under the court's inherent power)(quoting Avirgan v. Hull, 932 F.2d 1572, 1582 (11th Cir.1991)). And this Circuit has articulated the circumstances under which a court may find "bad faith": "A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. [An attorney] also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." Barnes 158 F.3d at 1214 (upholding sanctions imposed under court's inherent power)(quoting Primus Automotive Fin. Servs., Inc. v. Batarse, 115 F.3d 644, 649 (9th Cir. 1997)). And, "[i]f particularly egregious, the pursuit of a claim without reasonable inquiry into underlying facts can be the basis for a finding of bad faith." Id.

This Court is satisfied that attorney Miller's conduct was not just "tantamount to bad faith," it constituted "bad faith." Accordingly, pursuant to § 1927, the Court will require attorney Miller to personally compensate the Clinic for the reasonable attorneys' fees and expenses it incurred as a result of his conduct after April 9, 1999. Additionally, pursuant to its inherent power, the Court will require Miller to pay a $1000 fine into the registry of the Court for the waste of valuable judicial resources occasioned by his tactics. Pursuant to its inherent power, the Court will further require Miller to attend five hours of continuing legal education in ethics within the next year to sensitize him to the obligations that accompany the privilege of practicing law. See Malautea, 987 F.2d at 1546 (upholding

---

803 F.2d 1265, 1273 (2d Cir. 1986)(bad faith; unreasonable, vexatious, wanton conduct), cert. denied, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987).

$5,000 fine against each defendant and $500 fine against defense counsel under court's inherent power); Vandeventer v. Wabash National Corp., 893 F. Supp. 827, 833 (N.D. Ind. 1995)(imposing $500 fine on counsel with leave to set aside monetary sanction upon completing CLE seminar).  Finally, the Court will provide a copy of this Order both to The Florida Bar and to this District's Grievance Committee for their review and consideration.[36]

Plaintiff Santini

The Court has also considered Roberta Santini's conduct in this case.  She failed to inform the Court or the Clinic that she had received the first (undated) EEOC Notice either in her deposition or in her response memorandum and affidavit in opposition to the Clinic's summary judgment motion.  And she failed to appear at the May 21, 1999 hearing, despite being so ordered by the Court.

Santini testified at the June 1, 1999 hearing.  Although she then acknowledged having received the first Notice, she stated that she could not recall from whom she had received it.  Resolving the benefit of the doubt in her favor, the Court credits Santini's testimony that at the time of her deposition she did not remember receiving the first Notice. According to Santini, her receipt of the first Notice was not then a noteworthy matter

---

[36] See Code of Conduct for United States Judges, Canon 3(B)(3)("A judge should initiate appropriate action when the judge becomes aware of reliable evidence indicating the likelihood of unprofessional conduct by a judge or lawyer.") and Commentary to Canon 3(B)(3)("Appropriate action may include direct communication with the judge or lawyer who has committed the violation, other direct action if available, and reporting the violation to the appropriate authorities.").  See also Florida Rule of Professional Conduct 4-8.3(a)("Reporting Misconduct of Other Lawyers.  A lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects shall inform the appropriate professional authority.").

because her father had recently passed away and she was thereafter concerned about her mother's health.  And Miller testified that he did not discuss the first Notice with Santini while preparing for her deposition.

The Court, however, finds less credible Santini's hearing testimony as to the point at which she did recall receiving the undated Notice.  Santini testified that she remembered receiving the first (undated) Notice only when she spoke to Miller two or three weeks before the June 1, 1999 hearing.  She stated that during that conversation Miller reminded her that she had faxed that (undated) Notice to attorney Friedman.  According to Miller, he had discovered the faxed Notice in his former law firm's file on April 9, 1999.

But sometime between April 9, 1999 (Miller's discovery of the first Notice), and April 19, 1999 (the date of Elsa Santini's affidavit), Miller interviewed Elsa Santini about the delivery of the first EEOC Notice.  Roberta Santini acknowledged that she was present at her mother's interview.  And on April 19, 1999, Roberta Santini submitted her own affidavit in which she averred that she had not authorized Elsa Santini to accept mail on her behalf and that she had received and relied on the (second) March 2, 1998 Notice.  But Roberta Santini's affidavit failed to apprise the Court that she had, in fact, received the first Notice on or about February 2, 1998.  When questioned by the Court, Santini testified that she recalled receiving that first Notice only after she had submitted her April 19, 1999 affidavit. Yet, attorney Friedman disclosed that before she (Friedman) submitted her own April 19, 1999 affidavit, Miller had relayed to her Roberta Santini's contention that she (Friedman) had instructed Santini to disregard the first Notice.  The evidence strongly suggests, therefore, that at the time Roberta Santini submitted her April 19, 1999 affidavit, Miller had already refreshed her recollection of having received the first Right-to-Sue Notice.

41

Nonetheless, after considering the entirety of the evidence, the Court declines to impose sanctions against Roberta Santini.[37]  Although Santini should have known better than to provide misleading evidence, the Court is sufficiently concerned that she may have relied upon the advice of attorney Miller - an officer of the court - in submitting her affidavit and preparing her testimony.  The Court has decided to sanction attorney Miller and is not convinced that any further benefit would be achieved by also sanctioning Santini.  See Worldwide Primates, 87 F.3d at 1254 ("Imposition of sanctions on the attorney rather than . . . the client is sometimes proper since it may well be more appropriate than a sanction that penalizes the parties for offenses of their counsel.'")(quoting Jones v. Int'l Riding Helmets, Ltd., 49 F.3d 692, 694 (11th Cir. 1995)).

The Court additionally finds that Santini should not be sanctioned for her non-appearance at the May 21, 1999 hearing.  She testified that she had never seen the Court's order requiring her to appear and that when she inquired of her attorney, he advised her that she need not attend.   Miller corroborated Santini's testimony, acknowledging his advice.

Attorney Friedman

The Court has also considered whether to impose sanctions against attorney Heidi

---

[37]  A court may not impose sanctions against a party under § 1927; that statute is directed only to an attorney's conduct. Matta v. May, 118 F.3d 410, 414 (5th Cir. 1997) (Section 1927 sanctions "are, by the section's plain terms, imposed only on offending attorneys;  clients may not be ordered to pay such awards."). And Rule 11(c)(2)(A) prohibits the imposition of monetary sanctions against a party represented by counsel for violations of the Rule's certification requirement that claims and legal contentions are warranted by existing law or a nonfrivolous argument for extension of existing law or establishment of new law.  This Court, however, does have the authority to impose sanctions against a party for violating other provisions of Rule 11 or under its inherent power upon a finding of bad faith.

Friedman for submitting a misleading affidavit to the Court. In her affidavit, Friedman averred: "The Affiant never received from the EEOC the undated Right to Sue letter notwithstanding the affiant's name appearing on same. However, the undersigned did receive from the EEOC the Right to Sue letter dated March 2, 1998." Friedman Aff. at ¶ 3. Attorney Friedman argues that sanctions should not be imposed against her because her affidavit is truthful as to the facts contained therein. She further argues that sanctions are not warranted because she drafted her affidavit to address only the one specific issue that Miller had requested that she address. According to Friedman, after discovering the undated Notice, Miller and his associate had advised her that her affidavit would be used to support an equitable tolling argument.[38] Friedman testified that she did not review Miller's response memorandum to which her affidavit was attached before it was filed. She first obtained a copy of the memorandum on the day preceding the May 21, 1999 hearing and then only reviewed the portions of it that referenced her affidavit. Friedman contends that her superficial review did not alert her to Miller's subtle misquoting or paraphrasing of her affidavit. Friedman further states that based on the narrow purpose for which she was asked to provide the affidavit and the context within which she was asked to do so, she had no reason to believe Miller would misrepresent to the Court that Santini had not received the first Notice. She believed that his equitable tolling argument would require Santini to

---

[38] Although Miller's arguments in his response memorandum are not particularly clear, it appears that he did not rely on Friedman's affidavit to support equitable tolling. Rather, it appears that he used her affidavit to rebut the Clinic's contention that the 90 day period would run from counsel's receipt of an EEOC Notice. Further, it appears that he also used her affidavit to argue that the EEOC was at fault for Roberta Santini not having received the first (undated) notice because the agency did not send that Notice to her counsel, citing Stallworth. See supra note 11.

acknowledge receipt of both EEOC notices.

But Friedman's explanation for her affidavit - to support an equitable tolling argument - is not easily reconciled with her averments therein. Although relatively new to federal practice,[39] Friedman should have understood that to support an equitable tolling (between receipt of the first and second notices) of the 90 day period, she would have had to acknowledge that she (and/or Santini) did receive the first Notice but relied upon an EEOC (mis)representation to disregard it. Yet, Friedman averred precisely the opposite; she averred that she had never received the first Notice. And this assertion lent support to a very different argument - that she received only the second (March 2, 1998) Notice and, therefore, the 90 day period should begin to run from its receipt.

And Friedman's "literal truth" contention - she inserted the qualifiers "The <u>Affiant</u> never received" and "from the <u>EEOC</u>" - does not satisfy her obligation of complete candor to the Court.[40] (emphasis added).   The Clinic's counsel highlighted Friedman's approach: "And as I now understand what from your testimony while you didn't receive it from the EEOC you received it from your client?"  Friedman's response highlighted the ethical

---

[39]  The Court's records reflect that Friedman was admitted to practice in this District in 1996. <u>See</u> Fed. R. Ev. 201 (Judicial Notice of Adjudicative Facts).

[40]  <u>See</u> Oath of Admission to The Florida Bar ("I . . . will never seek to mislead the judge or jury by any <u>artifice</u> or false statement of fact or law.")(emphasis added); Florida Rule of Professional Conduct 4-3.3(a)(1),(2)(Candor Toward Tribunal; False Evidence; Duty to Disclose) and Comment ("[A]n assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry.  There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation."); Florida Rule of Professional Conduct 4-8.4(c) (Misconduct.  "A lawyer shall not . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.").

problem: "My firm, but not me necessarily.   From the client, not from the EEOC."
Transcript at 66 (DE 50).   Friedman should have known that these are distinctions without
a difference, the only material facts being the receipt (not the source) by counsel's firm (not
by a particular attorney).[41]   Inserting these qualifiers served only to provide irrelevant truth
to an affidavit that when fairly read and considered in context promotes a false inference.

Nor does the Court accept Friedman's characterization of her hearing testimony as
"frank" and "forthright."   At the end of the Clinic's cross-examination, Friedman
acknowledged that her law firm's file contained a copy of the undated Notice.   The Court
then inquired of her about the receipt of that Notice.   From this inquiry, Friedman should
have appreciated that the Court was trying to determine whether Santini and/or counsel
had received the first (undated) Notice more than 90 days before she filed her May 29,
1998 Complaint.   But rather than simply disclose that her firm's file copy of the undated
Notice reflects that Santini had faxed it to counsel in February 1998, she engaged the
Court in the following colloquy:

> The Court:  The right-to-sue letter that you say is located in the
> file, does it have any type of file stamp from your firm indicating
> when it was received?
>
> Friedman: No, it does not.
>
> The Court: Is there any type of envelope attached?
>
> Friedman: No, there is not.
>
> * * *
>
> The Court: When did you first learn of this [undated] right-to-
> sue notice?

---

[41]  See, e.g., Irwin, 498 U.S. 89, 111 S.Ct. 453; Ringgold, 796 F.2d 769.

Friedman: The only independent recollection I have of receiving the undated one was when I recently looked in the file approximately a month ago.

The Court: Do you know how it got there, when it was placed there?

Friedman: How it was actually placed in the file or how it actually got to the firm?  I am sorry.

The Court: Well, I guess probably both.  Do you know how it got to the firm and what the circumstances were under which it came to the firm?

Friedman: I don't have any independent recollection of how it got to the firm  I can only tell you what is on the document.

The Court:  I guess what I am getting at is this.  I am trying to find out was it sent in January and received in January or was it a situation in which in getting ready for this hearing you said to defense counsel, do you have an extra copy, can you send it over?

Friedman: It was not received from the EEOC, the copy that I have in the file.

The Court: Okay.  How do you know that?

Friedman: Because it was – there is writing on it.

The Court: Okay.  And what type of writing is on it.

Friedman: Writing from the person who sent it to me.

The Court: And who sent it to you?

Friedman: Ms. Santini

The Court: Ms. meaning the plaintiff or the plaintiff's mother?

Friedman: The plaintiff

The Court: The plaintiff sent it to you.  All right.  When did the plaintiff send it to you?

46

Friedman: Sitting here today I can't tell you the exact date.  But in the file there is the undated [Notice] with Ms. Santini [sic] writing to Heidi from Ms. Santini on the top of it?

The Court:  Ms. Santini again being the plaintiff Roberta Santini?

Friedman: Roberta Santini

The Court: So at some point unknown but prior to last month the plaintiff sent you a copy of a January –

Friedman: The undated one.

The Court: The undated right-to-sue notice.

Friedman: She sent it to my attention.  I don't ever recall getting it.

The Court: And there is, as you said, you may have covered this, there is nothing in the file that would reflect when it came in, no envelope, no log kept or anything of that nature, any billing reflecting a conversation about this with the client?

Friedman: There is a billing from me about a conversation I had with the client.

The Court: About this?

Friedman: Yes

The Court: And when was that billing?

Friedman: In February

The Court: Of 98?

Friedman: Yes

The Court: All right.  So then is it fair to say that your client Roberta Santini was aware of the letter and had possession of

the letter in February 1998?[42]

Transcript at 60-64 (DE 50).

In considering whether to impose sanctions against Friedman, the Court will grant her - as it did Miller and Santini - the benefit of every reasonable doubt.   Accordingly, although her affidavit enabled Miller to conceal critical information, the Court will not find that she knowingly joined with Miller in orchestrating the scheme.   Further, Friedman states that she assumed that Miller, her former supervisor and an officer of the court, would inform the Court that Santini had received the first (undated) EEOC Notice. Although such an assumption is not easily reconciled with the content of her affidavit and, in particular, the distinctions she drew, the Court will nonetheless resolve its misgivings in her favor and credit her statement. Accordingly, it will decline to find that she provided the affidavit in bad faith and will not require that she share with Miller in compensating the Clinic for its fees and costs.

The Court, however, remains troubled by Friedman's hearing testimony, which it considers less than forthcoming.  Although this Court can appreciate the discomfort and uncertainty of a young attorney in Friedman's position, it reminds her of this Circuit's admonition: "All attorneys, as 'officers of the court,' owe duties of complete candor and primary loyalty to the court before which they practice." Malautea, 987 F.2d at 1546.  The Court believes that this reminder - indeed, the content of this Order - sufficiently addresses the matter and, accordingly, declines to take any action against attorney Friedman.

---

[42] At that point, Friedman's attorney, invoked the attorney client privilege; the Court did not require Friedman to respond to the question.

## CONCLUSION

This Court is mindful that even the most well-intentioned attorneys occasionally make ethical judgments that might not withstand close scrutiny. Attorney Miller's conduct, however, was not such a good-faith instance of misjudgment: it was a bad-faith course of deceit. Even were the Court to accept Miller's lapsed memory contention and to simply admonish his investigative omissions, it could not tolerate his serial acts of deceit following the April 9, 1999 "discovery" of the undated Notice. As one district judge has observed:

> Of all the duties of a judge, imposing sanctions on lawyers is perhaps the most unpleasant. A desire to avoid doing so is understandable. But if judges turn from [§ 1927] and let it fall into disuse, the message to those inclined to abuse or misuse the litigation process will be clear. Misconduct, once tolerated, will breed more misconduct and those who seek relief against abuse will instead resort to it in self-defense. Although sanctions are warranted only in exceptional circumstances, when such circumstances arise the imposition of carefully tailored sanctions is a necessary aspect of an integrated system created by the federal rules [and statutes] for the just, speedy and inexpensive determination of actions.

Matthews v. Freedman, 128 F.R.D. 194, 206-07 (E.D. Pa. 1989)(citations omitted). It is with a sense of deep disappointment that this Court concludes that attorney Miller's course of conduct - concealing critical evidence, advancing spurious arguments, submitting misleading affidavits and testimony - warrants the imposition of sanctions and a referral to the appropriate disciplinary bodies.

## ORDER

For the foregoing reasons, it is hereby ORDERED as follows:

1.    Attorney Bartley Miller shall pay to the Clinic its excess costs, expenses, and attorneys' fees incurred on account of his concealing Santini's and counsel's receipt of the

first (undated) EEOC Notice;

2.    Within twenty (20) days of the date of this Order, the Clinic shall submit an affidavit setting forth all excess costs, expenses, and attorneys' fees incurred after April 9, 1999  Attorney Miller shall have fourteen (14) days thereafter to respond;

3.    Attorney Bartley Miller shall pay into the registry of the Court a fine of $1,000 within sixty (60) days of this Order;

4.    Attorney Bartley Miller shall attend five (5) hours of continuing education in the subject of legal ethics within one year from the date of this Order.  Upon completion of these hours, attorney Miller shall provide written notice to the Court and the Clinic, identifying the seminars attended.

DONE AND ORDERED at Fort Lauderdale, Florida, this 2nd day of September 1999.

BARRY S. SELTZER
United States Magistrate Judge

Copies to:

Bartley C. Miller, Esq.
2810 E. Oakland Park Blvd.
Fort Lauderdale, FL 33306

Catherine Adams, Esq.
Squire, Sanders & Dempsey L.L.P.
1300 Huntington Center
41 South High St.
Columbus, OH 43215

Alan L. Briggs, Esq.
Squire, Sanders & Dempsey, L.L.P.
1201 Pennsylvania Ave., N.W.
P.O. Box 407
Washington, D.C. 20044-0407

Heidi Friedman, Esq.
Thomas F. Panza, Esq.
Panza, Maurer, Maynard & Neel, P.A.
NationsBank Building
3600 North Federal Highway, Third Floor
Fort Lauderdale, FL 33308

Kevin P. Tynan, Esq.
The Florida Bar, Branch Staff Counsel
5900 N. Andrews Ave.
Suite 835
Fort Lauderdale, FL 33309

Richard T. Cole, Esq.
Chair, Southern District of
   Florida Grievance Committee
1390 Brickell Ave., Third Floor
Miami, Fla., 33131-3316